THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* DANIEL JAMES ,GLEESON, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOANNE SENUTA, Appellant.

Fourth Department, April 11, 1974.

*Hoffmann, Hartnett & Hubert* (*Terrance J. Hoffmann* and *Abraham Ziegler* of counsel), for appellants.

*Nathaniel B. Merrill, District Attorney,* for respondent.

MAHONEY, J.   Defendants appeal from judgments of Lewis County Court convicting defendant Gleeson on his plea of guilty of criminal possession of a weapon and of dangerous drugs in the 5th degree and convicting defendant Senuta on her plea of guilty of criminal possession of dangerous drugs in the 6th degree and of a weapon, as Class A misdemeanors.   The basis of their appeal is the alleged error of the court in its intermediate order of January 16, 1973 wherein it denied defendants' motions to suppress evidence on the ground that it was obtained in violation of the Fourth Amendment.   Despite their pleas of guilty, of course, defendants' right to appeal is preserved by statute (CPL 710.70, subd. 2).

During the summer of 1972 John Clarke, Jr. and his family were residing at his camp on Partridgville Road in the Town of Greig, Lewis County, New York.   The adjoining camp, known to Clarke as the Gleeson camp, was located approximately 200 to 250 feet from the Clarke camp with a few trees and bushes growing in the area between the two camps.   At that time the Gleeson camp was considered uninhabited.

On the evening of July 11, 1972 at approximately 7:00 P.M. Clarke and a friend, Jack Dwyer, heard a car stop in the Gleeson driveway and observed two people walk to the side of the Gleeson camp.   They did not go into the camp but stood outside for three or four minutes, one of them bending over and squatting down.   Clarke then heard one of the persons say, "Let's get the hell out of here", and thereupon they both returned to their vehicle and left.

Because of camp burglaries in the area, Mr. Clarke became suspicious and, with his friend Dwyer, walked over to the Gleeson camp where they noticed a shovel and evidence of recently moved earth underneath the camp.   He noticed a refrigerator-type box or chest underneath the camp, pulled it out, opened it and saw a box of .357 shells, a .22 caliber pistol, a paper bag and pyrex funnel with a tube on it with a smoking holder attached and a knapsack.   Neither Clarke nor his companion opened the paper bag or knapsack, which was actually

an army gas mask bag. Clarke replaced the articles in the box, returned the box to its position underneath the Gleeson camp and drove to the home of Joseph Levesque, a Lewis County Deputy Sheriff who lived six or seven miles from the Clarke and Gleeson camps. Clarke expressed concern to the deputy about his discovery of the .22 pistol and asked for further investigation. Without a search warrant, Deputy Levesque returned with Clarke and Dwyer to the Gleeson camp, opened the chest and made a cursory inspection of the contents. Later that same evening, Deputy Levesque met Deputy John Harris, who took the chest and its contents to the Lewis County Sheriff's office. The contents of the ice chest were inventoried and found to contain a .357 Colt revolver with the serial numbers filed off, a box of .357 shells, a .22 pistol, a funnel apparatus, a military type canvas bag which contained what appeared to be surgical clamps and a small weighing scale, and a paper bag containing two plastic bags which, a field analysis revealed, contained about five pounds of marijuana seeds.

The box of caliber .357 shells was retained in the Sheriff's office and the other articles were put back in the ice chest which was returned the following day by Deputy Sheriff Martin to the location where it was found under the Gleeson camp. A 24-hour surveillance of the Gleeson premises was established by officers of the Lewis County Sheriff's Department who stationed themselves in a trailer on the Clarke premises. During the period of surveillance, the officers, in order to improve their view of the Gleeson premises, cut brush along the boundary line between the two premises, in the course of which there was possible intrusion upon the Gleeson property.

On August 9, 1972 at about 4 o'clock in the afternoon, Deputy Cratsenberg, who was on duty watching the premises, observed a black Ford station wagon pull into the driveway of the Gleeson camp. Two persons, a male and female, left the car and went to the side of the Gleeson camp where the contraband items in the ice chest had been replaced. Deputy Cratsenberg observed the two persons bending over and then saw both of them enter the Gleeson camp. A few minutes later they came out of the camp carrying a gas mask container bag and two metal containers, returned to the station wagon and left the area at a high rate of speed. After reporting the incident by radio, Deputy Cratsenberg followed in an unmarked vehicle for a mile or so and came upon the departing vehicle whose operator, Daniel Gleeson, motioned Deputy Cratsenberg to pass by. Instead, Deputy Cratsenberg, who was not in uniform,

stopped, identified himself and asked the operator for his operator's license which defendant Gleeson produced. The passenger in the station wagon was defendant Joanne Senuta. Cratsenberg told Gleeson that he was operating a vehicle with a broken taillight and driving at a speed not reasonable and prudent, but allowed the vehicle to continue. The defendants drove on and Deputy Cratsenberg returned to the Gleeson camp to check the ice chest and, upon arriving at the camp, observed through the door that the ice chest was empty. This information was relayed by radio to Deputy Harris who was approaching the area into which the defendants were driving their car.

Deputy Cratsenberg again pursued the defendants' car, coming upon it stopped at the side of the road with the hood up, and Gleeson told him that the car was overheating. Cratsenberg told Gleeson that he would follow him toward town. As the two vehicles continued on, Deputy Cratsenberg contacted Deputy Harris by radio and it was arranged that the defendants' vehicle would be stopped at the corner of Pine Tree Road and Partridgville Road. On arrival at that intersection, Cratsenberg sounded his horn, directed the defendants' vehicle to pull over and asked the operator, defendant Gleeson, for the vehicle registration. Simultaneously, Deputy Harris arrived on the scene and told defendant Gleeson that he was under arrest for possession of a dangerous drug and directed Deputy Cratsenberg to search the vehicle. Defendant Gleeson inquired about a search warrant and Deputy Harris displayed one to Gleeson.

The search warrant in question was conceded by the People to be invalid and was so determined by the court prior to the taking of testimony in the suppression hearing herein, on the grounds that the supporting affidavit contained only conclusory allegations and failed to state facts showing reasonable cause to make the requested search and seizure.

While Deputy Harris took charge of the defendants, Deputy Cratsenberg made a search of their car and found two canister type containers containing marijuana seeds under the platform of the storage area in the rear of the vehicle and a bag containing some type of surgical or medical instruments in the glove compartment. As defendants were being placed in Deputy Harris' car, Deputy Cratsenberg raised the hood of defendants' vehicle and underneath the window washer bag found a military type bag containing a .357 magnum revolver and a .22 automatic pistol.

Citizen Clarke's inspection of the ice chest under the Gleeson camp and the subsequent search and seizure of the contents of

the same by members of the Sheriff's Department, without a warrant, which, except for the cartridge shells, were ultimately restored to the original location under the Gleeson camp on July 11, 1972, were illegal and invalid. Governmental participation in the otherwise lawful acts of private citizens renders searches of this kind invalid (*Burdeau* v. *McDowell*, 256 U. S. 465; *Sackler* v. *Sackler*, 15 N Y 2d 40; and *People* v. *Horman*, 22 N Y 2d 378). We note that citizen Clarke merely inspected some of the contents of the ice chest, and that the actual gathering or seizure was by governmental participation, namely, deputy sheriffs.

The People cannot justify the warrantless search of July 11, 1972 by Deputy Levesque based upon the doctrine of "exigent circumstances". This premise is best explained by the Supreme Court in *McDonald* v. *United States* (335 U. S. 451, 455–456), where the court stated, "Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police.  *  *  *  We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative." Nor can the preceding chronology be used in an attempt to validate that search under the rationale of *Johnson* v. *United States* (333 U. S. 10) or *Ker* v. *California* (374 U. S. 23).

Granted the existence of probable cause, the previous paragraph states the law, that in the absence of "exigent circumstances", there can be no search without a warrant. We must affirm the holding, therefore, that the search by Deputy Levesque on the evening of July 11, 1972 was violative of appellants' Fourth Amendment rights.

We now consider the validity of the warrantless arrest and search of appellants' vehicle on August 9, 1972. We are mindful, of course, of the "poisonous tree" doctrine enunciated in *Wong Sun* v. *United States* (371 U. S. 471). Despite the doctrine expressed by the Supreme Court in that case, we note that the court cited therein *Silverthorne Lbr. Co.* v. *United States* (251 U. S. 385, 392), in which the court stated, "this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source, they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed." It is clear, therefore, that all evidence is not "fruit of the poisonous tree" simply because

it did not come to light before the illegal actions of the police.

We conclude, therefore, that although the information obtained by Deputy Levesque through his warrantless search of the ice chest and its contents on July 11, 1972 was tainted, the information provided by citizen Clarke, who was not proscribed by Fourth Amendment restrictions, secured from his initial search on July 11, 1972 prior to Deputy Levesque's illegal search, can in no way be considered "tainted". Clarke's original search of the contents of the ice chest on July 11, 1972 revealed a gas mask container, a paper bag, smoking apparatus, a box of .357 shells and a .22 pistol (contraband). Combining this information with the observation of Deputy Cratsenberg on August 9, 1972 of defendants' activities at the Gleeson camp when they went to the location of the ice chest, removed it into the camp building, and left the premises with various items in a hasty departure, we find that adequate "exigent circumstances" existed for the finding of probable cause for the subsequent stopping and warrantless search of defendants' vehicle.

The alleged trespass of the Gleeson camp and cutting of bushes by deputies to permit them easier observation of the campsite do not forbid such holding. There is an abundance of testimony describing the normal visibility between the camps which negates the inference that the deputies' surveillance was based primarily on such minimal alleged trespass.

The initial arrest of the defendants by Deputy Harris for possession of a dangerous drug does not invalidate the arrest or subsequent search of the vehicle, since, based upon the untainted information outlined above, he had probable cause to believe that at least one weapon, namely, the .22 pistol, was being transported by the defendants. This information being untainted, probable cause was of such a certain character as to purge any allegation of taint in the Harris arrest and search. Thus, the defaced .357 Colt and the marijuana were properly used as evidence against the defendants without violating the Wong Sun doctrine, supra. Relying as we do upon the untainted information outlined above, we conclude that the second pistol and marijuana were not obtained solely by exploitation of the afore-mentioned search of July 11. This conclusion is fortified by Carroll v. United States (267 U. S. 132), in which it was held in effect that under the Fourth Amendment valid search of a vehicle on a public highway may be made without a search warrant where there was probable cause to believe that the vehicle contained contraband. Applying the holding in that case to the facts at hand, we hold that the warrantless

search of August 9, 1972 was valid, that the order denying suppression was properly made, and that the judgments of conviction should be affirmed.

MARSH, P. J., WITMER, GOLDMAN and DEL VECCHIO, JJ., concur.

Judgments unanimously affirmed.